55 So.2d 16 (1951)
CROW
v.
ALESI et al.
No. 3453.
Court of Appeal of Louisiana, First Circuit.
November 15, 1951.
Rehearing Denied January 10, 1952.
Writ of Certiorari Denied February 18, 1952.
Huckabay, Seale, Kelton & Hayes, Baton Rouge, for appellant.
Breazeale, Sachse, Wilson & Hebert, Baton Rouge, for appellee.
ELLIS, Judge.
Plaintiff is seeking to recover damages individually and for the use and benefit of his minor son as a result of a rear end collision between his panel bodied truck which he was driving in which his son was a guest passenger on December 21, 1948 at about 11:00 A.M., and a gravel truck owned and being driven by the defendant Alesi, which was insured by Lumbermen's Mutual Casualty Company, other defendant herein.
Plaintiff alleged that on the date of the accident he, accompanied by his son, was driving in a careful and prudent manner in a northerly direction on the Plank Road in East Baton Rouge Parish, and that for several miles along said highway a gravel truck owned and operated by the defendant Alesi was also proceeding in a northerly direction in front of plaintiff's truck, the distance separating the two trucks being in excess of 100 feet at all times prior to the collision, and that the defendant Alesi suddenly and without any warning of any kind whatsoever stopped his gravel truck *17 immediately in front of and directly in the traffic lane of plaintiff's on-coming truck. Despite every effort made by the plaintiff to stop his truck he was unable to do so because of the suddenness with which the Alesi truck stopped, and he ran into the back of this gravel truck.
In the alternative, and in the event the Court should find plaintiff guilty of any negligence which was the proximate cause or contributed to the accident, plaintiff plead that the defendant by his own actions created and confronted plaintiff with a sudden emergency from which he had no opportunity to extricate himself or his minor son.
The defendant denied all material allegations of the plaintiff's petition and in the alternative especially plead contributory negligence on the part of the plaintiff.
From an adverse judgment in the District Court the defendant has appealed and the plaintiff has answered the appeal individually in which he asks that the judgment be increased from $5,000 to $7,500 and otherwise affirmed.
In such cases the law is well-settled, and able counsel for plaintiff and defendant have thoroughly covered the subject in their briefs. Counsel for defendants, on the question of the obligations of the preceding and following drivers of motor vehicles on open highways, cites the expression of the court in Weitkam v. Johnston, La.App., 5 So.2d 582, 584, 585, and the cases and authorities therein cited as follows:
"Counsel for plaintiff, in contending that Miss Weitkam was not at fault, rest their argument on the well established rule that a following driver should operate his car at such speed as will permit of its being stopped however suddenly or unexpectedly the car ahead may be brought to a stop. This rule is expressly set forth in the cited traffic ordinance, paragraph `a' of Section 14 of Article V of which provides that
"`The operator of a motor vehicle shall not follow another vehicle or street car more closely than is reasonable and prudent, having due regard to the speed of such vehicle or street car and the traffic upon and the condition of the roadway.'
"That rule is expressly recognized in many cases, notably Greer v. Ware, La.App., 187 So. 842; Fuld v. Maryland Casualty Co., La.App., 178 So. 201; Session v. Kinchen, La.App., 178 So. 635 [638]; Roberson v. Rodriguez, La.App., 186 So. 853; Ardoin v. Robinson, La.App., 176 So. 228.
"We quote the following from the Greer case (187 So. 844):
"`According to the law and jurisprudence of this state, when two automobiles are being driven along a public road in the same direction, on a country road, the driver of the front car holds no duty to the car in the rear, except to use the road in the usual way in keeping with the laws of the road, and until he has been made aware of the presence of such rear car by signal or otherwise, he has a right to assume that there is no other vehicle in close proximity in his rear or, if there is one there, it is under such control as not to interfere with his free use of the road in any lawful manner. And in the absence of facts or circumstances that would put the driver of an automobile on notice of the near approach of another machine from the rear, he may drive slow or fast, select the parts of the road best suited to travel, stop or start at will. And where two automobiles are being driven along a highway in the same direction, the forward car has the superior right. This was held in the case of Stevens v. Dean, 6 La.App. 537.'
"This rule is particularly applicable where automobiles are on country roads, though the reasons on which it is based make it applicable also, to some extent, on city streets, but it does not, in any sense, relieve the driver of the leading car of the obligation to drive carefully and to avoid sudden and unexpected stops which may create dangerous emergencies. In other words, even though Johnston may have been at fault in crashing into the Weitkam car, which had been suddenly and unexpectedly stopped, his negligence in that regard would not, in itself, have caused the accident had Miss Weitkam operated her car in conformity with the provisions of the traffic ordinance and with the dictates of prudence."
*18 Counsel for plaintiff also cited the Weitkam case, supra, and recognized the rule of law that a motorist following other traffic is required to keep his automobile at a safe distance behind so as to enable him to stop his car in a sudden emergency. They cited cases to the effect that this rule does not apply where the emergency was created by the negligence of the forward motorist and in this connection has referred the Court to Leon v. Neal, La.App., 34 So.2d 276, 278, in which it was stated: "Plaintiff cites and quotes from cases wherein the sudden emergency doctrine was applied. In those cases it was held that a motorist should not follow another so closely that he could not stop his own vehicle before running into the forward one should a sudden emergency arise that would force the forward car to instantly stop. It is clear these cases are not applicable here because the emergency was created by the negligence of the forward motorist. There existed no condition or circumstance that made it necessary for him to stop his car quickly and without giving the proper signal."
Also see Shockley v. Norvell-Wilder Supply Co., La.App., 49 So.2d 51; Volume 60 C.J.S., Motor Vehicles, § 301, p. 710; Hill v. Knight, La.App., 163 So. 727; Reeves v. Caillouet, La.App., 46 So.2d 373; Adams v. Morgan, La.App., 173 So. 540; Smith v. Smith, La.App., 36 So.2d 388; Section 931 of Chapter 26, Blashfield's Cyclopedia of Automobile Law and Practice.
The question in the case is whether the defendant, as contended by the plaintiff, stopped suddenly without any warning so as to create an emergency, and whether the reason for defendant's sudden stop was due to his having been faced with an emergency or was entirely of his own volition. The answer to this question depends upon the facts.
The undisputed facts show that on the date of this collision the defendant was driving his gravel truck north on the highway known as the Plank Road in East Baton Rouge Parish, and following behind him for approximately nine miles was the panel truck driven by the plaintiff who was accompanied by his minor son. In front of the defendant on the highway was a jeep driven by the witness, Bud Rankin, who was engaged in the paper business. In the opposite lane of traffic, traveling in a southerly direction on this highway prior to the collision, was a truck belonging to the Crescent Furniture Company, driven by the witness J. A. Babin, loaded with mattresses or at least one mattress. Behind the mattress truck were one or two cars which are, to some extent, material to a correct interpretation of the facts as will be shown later.
It is also undisputed that the three named motor vehicles traveling in a northerly direction on the highway had been going at approximately 45 to 50 miles per hour.
It is not disputed that at the moment of the collision the defendant had just come to a stop or was practically stopped, however, the defendant disputes the fact that he made a sudden stop without warning, but, on the contrary, contends that he stopped gradually because the driver of a car in front of him had put out his hand and was making a gradual stop and finally did stop and then proceeded on up the highway. The plaintiff contends that there was no car between defendant and the jeep driven by the witness Rankin.
On the question of the sudden stop we have only the testimony of the plaintiff and his son. Plaintiff testified that he followed this truck a distance of 9 or 10 miles at 45 or 50 miles per hour and that he stayed from 100 to 150 feet to the rear at all times. Of the accident he testified:
"A. Well, I was driving just like most any person would be on the highway out in the wide open country, not dreaming of anybody stopping on the road and all of a sudden he just stopped and when I saw he was stopped, I tried to stop and tried to go around him and I tried to cut to the ditch and didn't have time and the left front of my truck kinder went under the right back corner of his truck, kinder at an angle.
"Q. Did you see the mattress fly off of the furniture truck? A. No, sir.
"Q. How far behind this gravel truck were you when you realized he was stopping or stopped? A. I would say I was *19 about one hundred to one hundred and fifty feet behind him.
"Q. Were you then going at the speed which you had been driving at? A. Yes, sir.
"Q. What distance would you say that the gravel truck took to stop in? A. Well, I would say he stopped as fast as he could, now how far he would go before he stopped, he would not go very far because it was just a sudden stop.
"Q. Did you apply your brakes? A. Yes, sir.

* * * * * *
"Q. Now, as I understand your testimony this truck suddenly stopped and you tried to go around him to the left, and you could not? A. That is right.
"Q. And you then turned back to the right? A. That is right.
"Q. Why did you turn back to the right? A. Tried to get into the ditch and miss him, just a long slope, it is not a deep ditch, and I tried to make it in there, but I could not, I didn't have time."
On cross examination plaintiff testified as follows:
"Q. What was the distance between your truck and the Alesi gravel truck when you realized first he was slowing down or about to stop? A. I would say at least a hundred feet.
"Q. What distance did the Alesi gravel truck travel after it started to stop? A. I don't know.
"Q. What distance were you away from the Alesi gravel truck at the time you applied your brakes? A. Just as soon as I saw he was stopping, I tried to go to the left and tried to go back to the right and I had my brakes on all the time.
"Q. What was the distance between you and the Alesi truck at the time you first applied your brakes? A. I don't know.
"Q. You say you had been traveling about one hundred or one hundred and fifty feet behind the Alesi truck, were you that distance when you realized he stopped? A. I would say about one hundred feet.

* * * * * *
"Q. Could you not have stopped your truck in the same distance this gravel truck stopped if you had been watching? A. No, sir.
"Q. Why not? A. Because he stopped so suddenly, didn't give me any warning.
"Q. If you had been watching could you have stopped in the same distance? A. If it had been in town on cross road or something like that, I probably could stop, but right out in wide open country like that, where you are not dreaming of anybody stopping right in the middle of the road, you could not.

* * * * * *
"Q. You were actually within about fifty feet when you applied the brakes? A. When I really shut down on them, when I realized I could not get by.
"Q. If you were fifty feet behind the Alesi truck when you saw you could not get by, how much further were you away from the Alesi truck when you realized the Alesi truck was slowing down? A. I would say fifty feet further.
"Q. In other words, you were one hundred feet behind the Alesi truck when you became conscious of the fact that he was stopping? A. That is right.
"Q. What distance do you say then that the Alesi truck traveled while you were traveling that one hundred feet? A. I don't know, I don't believe it traveled anywhere.
"Q. Beg your pardon? A. I don't think it traveled anywhere while I traveled that one hundred feet.
"Q. You think it was almost stopped?
A. Very near it."
The plaintiff's son testified practically the same as his father that he could not tell within what distance the defendant's truck stopped other than it was short, neither did he see the mattress when it blew off the furniture company truck nor did he see any hand signal given by Alesi indicating a stop, nor did he see the stop light flash on on the back of defendant's truck. He testified that they were not any less than 100 feet from the truck when he saw that it was slowing down and he called his *20 father's attention to it. The testimony of both these witnesses on the stopping of the truck was general and neither would venture any positive testimony as to how far the truck traveled before it came to a stop when they noticed it was stopping 100 feet away. It is also shown that the plaintiff did not blow his horn.
As opposed to the testimony of plaintiff and his son, the defendant testified that a car in front of him, occupied by an old man and lady, came to a gradual stop after signalling for a stop, and that when he saw the signal for a stop he put out his had and also came to a gradual stop which took him approximately 250 to 300 feet, but that he did not apply his brakes with such force as to leave any skid marks on the pavement. There is no testimony that the gravel truck left any skid marks on the pavement, however, the defendant testified that he was present immediately after the accident when the State police measured the skid marks made by the plaintiff's truck and that they were approximately 70 feet in length to the rear of his truck. Defendant also testified that the brake lights were working on his truck and were tested after the accident by him and the State police. He testified that this stop light measured six inches.
The witness Rankin testified that there was no car between his jeep and the defendant's truck and that, in his opinion, the defendant stopped in order to pick up the mattress which it is undisputed was across the highway a short distance from the point of collision, however, this witness did not throw any light on whether the defendant made a sudden or gradual stop. As to the witness Rankin's testimony that there was no car between the defendant's truck and his jeep, it is strange that he could testify to this when he repeatedly, on direct and cross examination, stated that he had not observed the gravel truck before he saw the cloud of dust caused by the collision. On direct examination he testified: "Q. Had you observed the gravel truck behind you before this cloud of dust went up? A. No. sir, I had not paid any particular attention."
On cross examination he seemed to indicate that after the mattress blew off the truck traveling in the opposite direction he was intent upon seeing whether the mattress man was notified that he lost the mattress and he slowed down and watched the car or two cars traveling behind the mattress truck to see if they caught up with the truck.
"Q. Why did you turn around? A. I saw the dust and figured there was a wreck.

* * * * * *
"Q. And up until that time you had not observed the gravel truck following you in the rear? A. No, sir."
On being examined by the Court this witness testified:
"A. I didn't pay much attention to it at all until I saw the dust, I was interested in the other fellow trying to catch this truck, it was in the mirror there and I just saw it and was not paying him any mind at all.
"Q. At the time you saw the dust, you can't say positively now whether the truck was moving or stopped? A. No, sir, I can't."
This witness' testimony leads one to believe that he could be mistaken when he testified that there was no car between him and the defendant's truck, for he freely admits that he did not know that the gravel truck was behind him and that when the mattress blew off the furniture truck he slowed down without giving any signal and watched to see if the other south bound car was going to catch the mattress man in order to notify him of his loss, and the next thing he saw was a cloud of dust and he figured there was a wreck and turned his jeep around and went back to the scene. His testimony is not conclusive proof that the defendant is deliberately falsifying.
The witness Babin testified that he was traveling south on the highway, and when the mattress blew off his truck he noticed that he had lost it and pulled over and stood on the running board and looked back and then is when he saw that the trucks had had the wreck, and he turned around and went back to the scene of the accident. It *21 was his opinion that the defendant had stopped to pick up the mattress, although he talked to the defendant immediately after the wreck and the defendant told him that there was a car in front of him, which Babin did not believe because he did not see it. Babin also admits that the defendant did not indicate that he had seen the mattress for he said nothing about picking the mattress up. The defendant positively denied that he saw the mattress blow off the truck, and the plaintiff, who was to his rear 100 to 150 feet, did not see this mattress when it was lost from the truck.
The District Court in its written reasons stated: "I am of the opinion that this accident was due to the sole negligence of Mr. Alesi in bringing his truck to a sudden, unexpected, unanticipated stop, not because of any emergency but possibly and probably to retrieve the mattress which had blown off of the Babin truck." We cannot agree with this conclusion in view of the testimony. The mere testimony of the plaintiff and his son to the effect that the defendant came to a sudden stop is refuted by the fact that there were no skid marks shown to have been made by the defendant's truck and no reason proven for such a stop on the part of defendant as he did not see the mattress blow off the truck and the first statement he made after the collision as to why he came to a stop was that a car in front of him had given the signal for and had come to a slow stop and he had done likewise. It would have been impossible for the defendant to come to a sudden stop so as to have created an emergency without forcibly applying the brakes, of which there was no testimony and no indication. The argument of counsel for defendant in his brief is sound, to the effect that: "* * * If Mr. Alesi were travelling forty miles per hour, the minimum distance within which he could have brought his truck to a stop is 115 feet, allowing him the average reaction time of 3/4 of a second within which he travelled forty-four feet and the actual stopping distance of a car with brakes in excellent condition of one hundred fifteen feet. If Mr. Crow were one hundred feet behind Alesi at the time Alesi started to stop his car, Mr. Crow had a total distance for reaction time and stopping of two hundred fifteen feet. (See Chart, Blashfield's Cyclopedia of Law and Procedure, Vol. 9, Part 2, Sec. 6237, P. 706.)"
There is no doubt that the Alesi truck came to a stop but the evidence does not justify the finding that it came to a sudden, unanticipated stop. The burden of proof is upon the plaintiff to prove this fact, which he has not only failed to do but this contention is successfully refuted by the positive evidence to the contrary. This collision was due to the negligence of the plaintiff either in not keeping a proper lookout, or, if he did see the truck slowing down, instead of doing likewise, he attempted to pass and perceived an on-coming car and of necessity was forced to apply his brakes and pull to his right, and at that time he was too close to avoid striking the rear of the Alesi truck.
It is, therefore, ordered that the judgment of the District Court be reversed, and plaintiff's suit dismissed.